IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| REBECCA L. SMITH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 08-CV-665-PJC |
| ) | |
| MICHAEL J. ASTRUE, Commissioner of the ) | |
| Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Claimant, Rebecca L. Smith ("Smith"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Smith's application for disability benefits under the Social Security Act. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Smith appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Smith was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

**Claimant's Background**

Smith was 41 years old at the time of the hearing before the ALJ on June 1, 2007. (R. 29-30). She completed high school. (R. 30). She had not worked since her date of onset, September 13, 2004. *Id.* Before that time, she had worked as a deliverer for the United States Postal Service. (R. 30-31). On her last day of work, she had difficulty getting in and out of her

vehicle. *Id.* Up until her last day of work, she had been having trouble with pain in her back and her leg. (R. 31). At the time of the hearing, she testified the biggest limitation she had in being able to work full time was the same problem with her back and hip that caused pain. *Id.* She described the pain as intermittent, stabbing, and burning, down her right leg to the knee and sometimes up into her groin. (R. 31-32). She experienced numbness in her right leg. (R. 32). She also had a mass approximately the size of a grapefruit below her right knee that her doctor had described as a "weird case." (R. 33).

Smith testified that she was about 5' 8" tall and weighed about 334 pounds. *Id.* Her weight could vary between 275 to 350 pounds, depending on how much fluid her body was retaining. (R. 33-34). She especially had trouble with fluid retention in her legs. (R. 34).

She estimated that she could sit for about thirty minutes at a time before she would want to change positions due to pain in her back and the swelling and stiffness of her legs. *Id.* She had a walker at the hearing, and she testified that she used it on a regular basis, even at home. (R. 35). If she could lean on the walker, she could stand about ten minutes before needing to change positions. (R. 34-35). She had broken her left ankle and sprained both ankles in the past when attempting to walk. (R. 35-36). With the walker, she could walk about five to ten minutes. (R. 37). Even with the walker, she had sometimes lost her balance and fallen. *Id.*

Her doctor had told her that he wanted her to elevate her legs when possible to help with the fluid retention in her legs. (R. 36). She estimated that she spent about 75% of her day with her feet elevated, and the elevation helped a lot with the swelling and eased the pain in her ankles. (R. 37-38).

Smith testified that she also had bursitis in her shoulders, and she had been injected in her left shoulder with steroids to ease the pain in that joint. (R. 38). She had tendonitis in her left

arm and hand that had started when she was working at the post office. (R. 38-39). She had difficulty grasping and holding things with her left hand. (R. 39). Repetitive use of her hands would cause pain. *Id.*

She had just been diagnosed with diabetes, and she had injuries that were not healing properly because of that condition. (R. 39-40). She had red and shiny skin on her right leg that the doctors diagnosed as cellulitis and that needed treatment with antibiotics. (R. 40). She experienced dizziness that she believed was a side effect of her medications for high blood pressure. (R. 40-41). She slept a lot, and she believed that was also a side effect of the medication. (R. 41). While she did not sleep soundly, she might sleep for about nine hours at night, and she would nap approximately four hours during the day. (R. 41-42).

She could not squat or kneel, because her ankles would not support her. (R. 42). If she needed to pick up something from the floor, she would use a mechanical "grabber." (R. 42-43). She could reach down to touch her knees, although it might cause some pain in her back. (R. 43). She could not reach to touch her toes, without falling over. *Id.* She could lift a gallon of milk with her right hand, but she wasn't sure she could lift it with her left hand. *Id.*

She liked to watch television. (R. 43-44). It was hard for her to vacuum or to do the dishes because of the time it required standing. (R. 44). She would have to take breaks and return to those chores. *Id.*

To help with the pain, she would take her medication, and she would lie down and rest. *Id.* She had steroid shots in her hip and shoulder as often as possible. (R. 44-45). She found that hot showers did not help, but she had not tried heating pads, ice packs, massage, or manipulation. (R. 45).

Smith saw Curt M. Coggins, M.D. on November 10, 2003 because her left arm hurt, she

3

had trouble gripping with the left hand, and it hurt to lay on her left shoulder. (R. 309-11). She was told to take naproxen consistently. (R. 311). On September 13, 2004, she presented with back pain, with the pain shooting down her right leg to the knee. (R. 302-04). Limited range of motion and localized tenderness in Smith's lower back were noted. (R. 303). She returned for follow up on September 27, 2004. (R. 294-97). Smith stated that she had been doing better, but then reinjured herself, causing her back to be painful. (R. 295). She stated she had a hard time walking due to the pain, and she presented in a wheel chair. (R. 295-96). On examination, her hips were both noted to have limited range of motion and pain. (R. 296). On September 30, 2004, Smith was seen again because she complained that her lower back and hip pain was severe, with only partial relief from the pain medications. (R. 291-93). She was admitted to the hospital for evaluation. *Id.*

Smith was hospitalized at St. John Medical Center from September 30 through October 15, 2004. (R. 190-215). She was diagnosed with having a spinal abscess with staphylococcus. (R. 204). An operation was performed on October 7, 2004, after the doctors were able to obtain MRI confirmation of an epidural abscess at the L3-L4 level, left predominant. (R. 213-15). The operation involved a foraminotomy, evacuation of granulation tissue and a pus pocket, and installation of a drain. (R. 213-14).

Smith returned to Dr. Coggins' office on December 21, 2004, stating that her right hip was "giving out," and she continued to not feel well and to be fatigued. (R. 284-85). The assessments were lumbar radiculitis and low back pain. (R. 284). An MRI of Smith's lumbar spine on December 27, 2004 showed postoperative changes, but with no significant stenosis demonstrated. (R. 336). At a follow-up appointment on January 4, 2005, Smith said that her back was still sore, but that most of the pain was from the right hip, and she had swelling in her

4

legs. (R. 280-82). Assessments were lumbar radiculitis, back pain not otherwise specified, dependent edema, and fatigue. (R. 282). On January 11, 2005, Smith reported that she had a burning feeling in her right leg, but that the swelling in her legs was better. (R. 274). She said that the fatigue continued, she had trouble with dizziness, and she felt she could "nod off." *Id.* Assessments were sciatica, dizziness, and hypertension not otherwise specified. (R. 275).

On January 19, 2005, an electromyogram and nerve conduction study was done regarding Smith's "peresthesis" and weakness of her right leg. (R. 184-85). The examining physician noted "considerable edema" of Smith's right leg. (R. 185). The impression was polyneuropathy. *Id.*

On February 2, 2005, Smith was seen at Dr. Coggins' office for an injection in her right hip due to continued pain, and she complained of swelling in both legs. (R. 271). Notes of the physical examination state "Heel and toe walking on the right is weaker. Dependent edema in [lower extremities] 2+/4." (R. 272). Assessments were low back pain, hip pain, and edema not otherwise specified. *Id.* Smith had an epidural right L5 steroid injection by Martin L. Martucci, M.D. on February 8, 2005. (R. 167-70). At a follow-up appointment with Dr. Coggins on February 18, 2005, it was stated that Smith's pain was about the same and "did not bother her a lot." (R. 265). It was also noted that she had trouble walking after standing a while. *Id.* Examination noted tenderness of her right hip, and the assessment included bursitis. (R. 267). In the symptoms portion of the visit record on March 29, 2005, a note was made that Smith had seen Dr. Josephson who diagnosed hip bursitis and gave Smith instructions to use a walker. (R. 260). Continued low back pain was noted. *Id.* Smith was given an injection in her right hip. (R. 261).

On April 12, 2005, Smith presented with tenderness of her right ankle and a sensation

5

that it would "give out on her sometimes." (R. 258). She stated that standing for a long time caused severe pain, and she also complained of a numb and tingly feeling in her right thigh. *Id.* On examination, swelling of her lower right leg was noted, as well as a soft tissue mass. (R. 259). The assessments were right ankle pain and right lower extremity mass. *Id.* X-ray of Smith's right ankle on April 12, 2005 showed no fracture or dislocation. (R. 335). An MRI on April 18, 2005, of the abnormal soft tissue of Smith's right leg showed no significant abnormality. (R. 347). At Dr. Coggins' referral, Smith attended physical rehabilitation beginning April 21, 2005. (R. 175-78).

On May 3, 2005, Smith presented for follow up and also for bruising of her right foot. (R. 249). Smith stated that physical therapy was slow, that her right leg dragged, she fatigued easily, and her low back was painful at the end of the day. *Id.* On examination, decreased strength in Smith's right leg was noted, and the assessment included right leg weakness. (R. 251). The notes state that there was a discussion of Smith's "current disability and note to employer regarding the slow rehab from her neurologic injury caused by the spinal abscess." *Id.* An X-ray of Smith's left foot on May 3, 2005 showed minor toe degenerative changes, with no fracture or dislocation demonstrated. (R. 334).

Smith presented on May 26, 2005, because she had fallen the night before and hurt her left foot. (R. 247). Swelling and reduced range of motion in her left ankle and foot was noted, and it was assessed as a sprain. (R. 248). May 26, 2005 x-rays of Smith's left ankle showed soft tissue swelling but were negative for fracture or dislocation. (R. 333). X-rays of her left foot on that same day showed a prominent plantar calcaneal enthesophyte with no other significant bony or articular abnormality. (R. 331-32). She was seen for follow up on June 2, 2005. (R. 244-46). On June 23, 2005, Smith stated that she had reinjured the ankle, and moderate and diffuse

swelling was noted. (R. 242-43). The assessment was ankle fracture, and it appears that she was prescribed to use a wide wheelchair. (R. 241, 243). X-rays of her left foot on June 23, 2005 showed significant soft tissue edema, with the appearance of an avulsion fracture, with no definite dislocation seen. (R. 330-31).

On August 25, 2005, Smith returned to Dr. Coggins' office, and it was noted that she had been wearing a boot. (R. 236). Smith complained that her right hip pain had returned after doing well following the previous injection. *Id.* She was given another injection to the right hip. (R. 237). On September 22, 2005, Smith stated that her left ankle still felt weak, and she had some pain in both hips. (R. 229-30). It appears that edema of her ankles was noted on examination, and a note of an "antalgic" gait was also included in this record. (R. 231). On October 13, 2005, Smith complained that her worst symptom was "the dragging right leg when she gets tired." (R. 226). She also complained of right hip pain and numbness. *Id.* The physical examination appeared to show moderate edema of Smith's legs with "decreased sensation and strength in right leg." (R. 227). She was seen for follow up on November 3, 2005. (R. 223-25). On December 1, 2005, it was noted that Smith had stumbled and fallen, with pain in her ankle and her hips that was severe and making it difficult for her to get around. (R. 218-19). Smith complained that she dropped items and was unable to carry items. (R. 219). The assessments included back pain, lumbar radiculitis, hip bursitis, and chronic ankle pain. (R. 220).

On January 3, 2006, Smith presented with pain in her low back, right leg, hip, left ankle, shoulder, and knees. (R. 404). Trouble sleeping was also noted. *Id.* Smith was described as morbidly obese. (R. 405). Physical examination confirmed tenderness of Smith's shoulder, lumbar spine, left ankle, and right hip, with limited range of motion of her back. Assessments included chronic back pain, persistent right ankle pain, hip bursitis, left shoulder pain, and

depression. (R. 406).

      A note on June 13, 2006 states that Smith called because the large lump in her leg had opened up and drained a clear liquid. (R. 393). Smith was seen by Dr. Coggins the next day, and she stated that she could hardly walk because she would fall due to her problems with her left ankle and right leg. (R. 391). Moderate edema of her legs "with brawny changes" was noted, and the assessments included cellulitis of leg. (R. 392). On July 12, 2006, Smith presented stating that her right hip was her worst problem. (R. 386-87). She stated that she had been elevating her legs and that had helped with the swelling. (R. 387). On examination it was noted that "[d]ependent edema is prominent." (R. 388). Smith was given another injection to her right hip. *Id.* She was seen for a recheck on August 9, 2006. (R. 380-82). At a recheck on September 6, 2006, Smith complained that her left shoulder was her worst problem, and she was given an injection. (R. 455-56). At a follow-up appointment on October 4, 2006, it was noted that Smith had fallen once since her September appointment. (R. 453-54). On November 29, 2006, another injection was given to Smith's right hip, and a 2.5 cm superficial ulceration was noted on Smith's right leg. (R. 448-49).

      On March 20, 2007, Smith complained of numbness experienced in the previous month in her left hand, and another fall was reported. (R. 458). Another injection was given in her right hip. (R. 458-59). She was seen again on April 9, 2007. On April 30, 2007, it was noted that Smith had fallen again, and the assessment included cellulitis of leg. (R. 533-34). On May 14, 2007, "brawny discoloration with edematous appearance of both ankles" was noted. (R. 525-26). The assessment included acute renal failure. (R. 526). Smith was seen for follow up on May 23, 2007. (R. 515-16).

Smith saw Jeff Halford, D.O. for a consultation on June 10, 2007. (R. 509-11). Dr. Halford noted reduced range of motion of Smith's lumbar spine due to pain, and he noted that the lumbar paraspinals were tender. (R. 510). His impressions were chronic pain, low back pain with lumbar radiculopathy, morbid obesity, diabetes, and renal insufficiency. (R. 510-511). Smith saw Dr. Halford again on July 5, August 3, and September 28, 2007, for follow up. (R. 493-94, 500-01).

Smith saw Dr. Coggins again on July 5, 2007. (R. 505-06). Upon physical examination, her legs were noted as having minimal erythema but persistent edema, and one of her assessments was cellulitis abscess. (R. 506). On August 2, 2007, it was noted that Smith had fallen the previous weekend. (R. 495).

Agency non-examining consultant Janice B. Smith, Ph.D. completed a Psychiatric Review Technique form on February 15, 2006, stating that Smith's mental impairments were not severe. (R. 348-61).

Agency consultant Subramaniam Krishnamurthi, M.D. completed a Comprehensive Internal Medicine Evaluation of Smith on March 17, 2006. (R. 363-67). On physical examination, Dr. Krishnamurthi noted that Smith was markedly obese, with a weight of 344 pounds. (R. 363). He noted 1-plus pedal edema. *Id.* He stated that Smith used a cane, not prescribed by a physician, at home, but had not brought it to the examination. (R. 364). He observed her gait as "normal, steady and stable," although he noted that it was slow due to back pain and obesity. *Id.* He stated that heel walking and toe walking were very difficult and that Smith could get on the examination table "with some difficulty." *Id.* He found 5/5 strength in Smith's lower extremities. *Id.* He said that her range of motion for her dorsolumbar spine and for her hip joints was reduced "due to pain and obesity." *Id.* He found the range of motion of

9

Smith's ankle joints to be within normal limits, although "associated [] with some pain." *Id.* Range of motion of Smith's right shoulder was reduced due to pain. *Id.* His final impression was arthralgia of the hips, right shoulder, and ankles, morbid obesity, and hypertension. *Id.*

Non-examining agency consultant Bob Dodd, M.D. completed a Physical Residual Functional Capacity Assessment on May 2, 2006. (R. 368-75). Dr. Dodd found that Smith had the RFC to perform the whole range of sedentary work, with no other limitations. *Id.* In the portion of the form for narrative explanation of his conclusions, Dr. Dodd summarized the examination of Dr. Krishnamurthi and Smith's history of spinal abscess. (R. 369). His one other comment was "ADL is active as suspected with mobility issues due to obesity with pain noted." *Id.*

## Procedural History

On December 15, 2005, Smith filed applications for disability insurance benefits and supplemental security income benefits under Title II, 42 U.S.C. § 401 *et seq.* (R. 88-95). In these applications, Smith alleged disability beginning September 23, 2004. Smith's applications for benefits were denied in their entirety initially and on reconsideration. (R. 53-61). A hearing before ALJ Lantz McClain was held June 1, 2007, in Tulsa, Oklahoma. (R. 25-48). By decision dated August 27, 2007, the ALJ found that Smith was not disabled at any time through the date of the decision. (R. 11-21). On September 17, 2008, the Appeals Council denied review of the ALJ's findings. (R. 1-4). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. § 404.981.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment." 42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim.  20 C.F.R. § 404.1520.[1]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."  *Williams*, 844 F.2d at 750.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion.  *Id.*  The court's review is based on the record taken as a whole, and the

---

[1]  Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001) Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

11

court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

The ALJ found that Smith met insured status through December 31, 2009. (R. 13). At Step One, the ALJ found that Smith had not engaged in any substantial gainful activity since her alleged onset date. *Id.* At Step Two, the ALJ found Smith had severe impairments of arthritis of the hips, right shoulder, and ankles, post left ankle fracture, high blood pressure, and obesity. (R. 14). At Step Three, the ALJ found that Smith's impairments did not meet any Listing. (R. 15).

The ALJ determined that Smith had the RFC to perform the full range of sedentary work. (R. 15). At Step Four, the ALJ found that Smith could not return to past work. (R. 20). At Step Five, the ALJ found that the Grids[2] directed a finding of not disabled. (R. 20-21). Therefore, the ALJ found that Smith was not disabled at any time through the date of his decision. (R. 21).

### Review

On appeal, Smith complains that the ALJ erred in his credibility analysis and in his use of the Grids at Step Five. The Court agrees with Smith that both of these aspects of the ALJ's decision are erroneous and require reversal.

The Grids are the Medical-Vocational Guidelines set forth in 20 C.F.R. Part 404, Subpart

---

[2]   The Grids are the Medical-Vocational Guidelines set forth in 20 C.F.R. Part 404, Subpart P, Appendix 2.

P, Appendix 2.  The Grids are based on the four relevant factors contained in the Social Security Act: physical ability, age, education, and work experience.  They provide a "shortcut" of rules that determine whether jobs exist in significant numbers that a claimant with certain characteristics can perform.  *Daniels v. Apfel*, 154 F.3d 1129, 1132 (10th Cir. 1998); *Evans v. Chater*, 55 F.3d 530, 532 (10th Cir.1995).  The Grids are based on exertional, or strength, limitations.  "[N]onexertional limitations are not factored into the grids but must be taken into account in determining a claimant's RFC."  *Williams*, 844 F.2d at 752.   Nonexertional limitations are those that affect Claimant's ability to meet the demands not involving strength of a job. 20 C.F.R. § 416.969a(a).  The Grids may not be applied conclusively if claimant has a nonexertional limitation that "significantly limit[s] his ability to perform the full range of work in a particular RFC category on a sustained basis." *Williams*, 844 F.2d at 752 (quotations omitted).  In such case, the ALJ may use the Grids as a framework, but must also take the claimant's nonexertional limitations into account when determining if there are a significant number of jobs in the national economy that claimant can perform on a regular basis.  *Id.*

In the present case, it was uncontroverted that Smith experienced significant pain, and that nonexertional limitation made the ALJ's use of the Grids erroneous.  Smith sought medical treatment consistently from her onset date in September 2004 through 2007, and virtually every individual doctor's visit noted Smith's pain from her various conditions, including the bursitis of her right hip and her difficulties with both legs and ankles.  Smith was evaluated and treated by specialists due to her chronic pain. (R. 166-70, 493-94, 500-01, 509-11).  The agency consultant who examined Smith noted her pain in connection with her dorsolumbar spine, hips, ankles, and right shoulder, along with the associated restricted range of motion in those joints.  (R. 363-67).  This is not a case in which the only evidence of pain is the claimant's subjective complaints.

13

Here, there is ample objective medical evidence of Smith's pain.

In these circumstances, the ALJ could not resort to the use of the Grids. *See Thompson v. Sullivan*, 987 F.2d 1482 (10th Cir. 1993). In *Thompson*, the claimant had a back condition established by objective medical evidence, and she alleged pain. The ALJ made many errors in his consideration of the claimant's allegations of pain, but among those was his failure to continue to consider the claimant's pain even after he found her allegation of disabling pain not to be fully credible. *Id.* at 1490-91.

> Pain, even if not disabling, is still a nonexertional impairment to be taken into consideration, unless there is substantial evidence for the ALJ to find that the claimant's pain is insignificant.

*Id.* Because the claimant's physician had stated that the claimant had moderately severe pain that worsened with activity, the ALJ in *Thompson* could not find the pain to be insignificant, and he had to consider the effect of pain on the claimant's ability to do jobs at Step Five. *Id.* at 1491. Further the ALJ could not rely on the Grids at Step Five, but needed the testimony of a VE "to determine what limitation [the claimant's] acknowledged back and leg pain might impose on her capacity to do sedentary work." *Id.*

In the present case, even if the ALJ's credibility determination had been supported by substantial evidence, the ALJ still had to continue to consider Smith's pain throughout his analysis, because it is uncontroverted that her pain was not insignificant. In these circumstances, the ALJ could not resort to the short cut method of using the Grids, but he was required to fully explore the extent of Smith's pain and the impact that pain would have on the numbers of jobs in the sedentary category that would remain available to her. After the ALJ determined the effect of Smith's acknowledged pain, then the ALJ needed to have the testimony of the VE in order to have substantial evidence that there were significant numbers of jobs that Smith could perform.

*Id.*; *Baker v. Barnhart*, 84 Fed. Appx. 10, 13-14 (10th Cir. 2003) (unpublished) (use of Grids was error when the ALJ had found chronic back pain to be a severe impairment at Step Two).

*Baker* addresses additional and related errors which are of concern to the undersigned and which must be addressed on remand. In addition to the failure of the ALJ in *Baker* to adequately discuss the claimant's acknowledged pain in determining her RFC, the ALJ had also failed to discuss the effect her obesity had on her RFC. *Baker*, 84 Fed. Appx. at 14. In the present case, Smith's obesity, and the effect of her obesity at least in restricting her range of motion, was acknowledged by all of her medical providers and by the agency's examining consultant. Further, the examining consultant acknowledged that Smith's gait was slow due to her obesity and that heel walking and toe walking were "very difficult." (R. 364). Smith's treating medical records are filled with references to her frequent falls, and her fracture of her left ankle apparently resulted from one of these falls. (R. 218-19, 241-48, 391, 453-54, 458, 495, 533-34). As *Baker* makes clear, the ALJ was required to discuss the effect that Smith's uncontroverted obesity and instability had on her RFC, and his failure to do so was error. *Baker*, 84 Fed. Appx. at 14.

A related issue, and one addressed in *Baker*, is the lack of substantial evidence supporting the ALJ's finding that Smith had the RFC to perform the full range of sedentary work. The Tenth Circuit in *Baker* stated that the ALJ's conclusion that the claimant could perform the full range of sedentary work was only supported by a "checkmark-style RFC assessment done by an agency medical consultant." *Baker*, 84 Fed. Appx. at 14. The court said that this RFC assessment could not constitute substantial evidence because it was not supported by any medical evidence. It appears that there had not been a consultative examination in *Baker*, and the RFC had been completed by a non-examining consultant, whereas in the present case Smith

was examined by Dr. Krishnamurthi. The undersigned nevertheless has the same concerns that the Tenth Circuit expressed in *Baker*.

While Dr. Dodd superficially summarized Dr. Krishnamurthi's examination findings in explaining his conclusion that Smith was capable of performing the entire range of sedentary work, it is difficult to see how Dr. Krishnamurthi's findings support that conclusion. As previously discussed, Dr. Krishnamurthi found that Smith had pain and limited range of motion in her dorsolumbar spine, hips, ankles, and right shoulder. (R. 363-67). These findings do not support Dr. Dodd's checkmark indications that Smith had no limitation in her ability to push or pull, including use of foot controls. (R. 369). They do not support his checkmark indications that no postural limitations were established, meaning that Smith could climb stairs or ladders, could balance, stoop, kneel, crouch, and crawl, and that Smith could reach in all directions. (R. 370-71). Dr. Dodd's checklist appears to be directly contradicted by Dr. Krishnamurthi's consultative examination, as well as the uncontroverted evidence of Smith's problems with her hips and ankles, her pain, her obesity, and her frequent falls. Dr. Dodd's unhelpful last sentence in his narrative explanation of his conclusions does nothing to illuminate how he reached them: "ADL is active as suspected with mobility issues due to obesity with pain noted." (R. 369). Given its inconsistencies with the medical evidence, and Dr. Dodd's lack of explanation of how he arrived at his conclusions, Dr. Dodd's checklist is not substantial evidence supporting a finding that Smith could perform the entire range of sedentary work. *Baker*, 84 Fed. Appx. at 14.

The undersigned also agrees with Smith that the ALJ's credibility determination is not adequate. Credibility determinations by the trier of fact are given great deference. *Smith v. Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart*, 287 F.3d 903, 910 (10th Cir. 2001). In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186.

In discussing Smith's credibility, the ALJ first included a boilerplate statement that Smith's statements were "not entirely credible in light of discrepancies between the claimant's alleged symptoms, and objective documentation in the file." (R. 19). This statement is not specific and it is not linked to any evidence. This Court is left completely in the dark regarding what the ALJ viewed as "discrepancies" between the medical record and Smith's allegations. *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004) (boilerplate statements "[fail] to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that [the claimant's] complaints were not credible.")

The next sentence states that Smith's medical treatment "has been essentially routine and conservative in nature." *Id.* Again, this is not a specific reason linked to evidence, although the ALJ refers to three exhibits, two of which are treatment records of Dr. Coggins that total almost 200 pages. The undersigned believes that Smith's hospitalization in September and October 2004 with the operation to remove an infection from her spine, Smith's referral to a pain specialist who performed an epidural steroid injection, and Smith's repeated injections by Dr. Coggins of her shoulder and hip in an attempt to relieve her pain, were not "routine," although it might be possible to characterize them as "conservative." (R. 167-70, 190-215). This boilerplate statement of the ALJ in any case did nothing to bolster his credibility determination.

The ALJ then noted that Smith could do some light housekeeping, with breaks, and he

17

stated that she could go shopping and care for her own personal needs. (R. 19). These references to minimal ADLs, on their own, do not constitute substantial evidence supporting the ALJ's credibility determination. *Thompson*, 987 F.2d at 1490 ("ALJ may not rely on minimal daily activities as substantial evidence that a claimant does not suffer disabling pain").

Finally, the ALJ then discussed Smith's allegation of dizziness, whether this was a side effect of her medication, and whether this side effect could have been controlled if Smith's medications "were properly regulated." (R. 19). The undersigned has significant doubts that this discussion could ever support a credibility determination,[3] but in any case it does not support the ALJ's credibility determination here because Smith did not rely on dizziness, or any side effects of her medications, as a primary reason why she was disabled. Smith testified that the pain in her back and hip was her primary reason for being disabled at the time of the hearing, and she described the effects of this pain on her ability to sit, stand and walk. (R. 31-37). She discussed her problems with her ankles, her persistent edema, and her cellulitis, including her need to elevate her legs for significant portions of the day. (R. 36-40). It was only after discussing all of this, that Smith testified regarding side effects of dizziness and sleepiness from her medications. (R. 40-42). The ALJ's focus on a minor portion of Smith's testimony, even if his reasoning were valid, does not support his credibility determination. The ALJ's credibility determination was not adequate because he did not comply with the requirement that he give specific reasons for that determination and that he link those reasons to substantial evidence.

---

[3] The reasoning of the ALJ here is similar to the rejected reasoning of the ALJ in *Miller v. Chater*, 99 F.3d 972, 977 (10th Cir. 1996). The ALJ in *Miller* had stated that the side effects of the claimant's medications could not have been as severe as alleged, or the doctors would have prescribed different medications. The Tenth Circuit rejected this statement as an assumption that did not constitute substantial evidence.

**Conclusion**

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 25th day of January 2010.

Paul J. Cleary
United States Magistrate Judge